Mr. Justice NELSON
 

 delivered the opinion of the, court.
 

 It is insisted by the learned counsel for the claimant, that all the depositions in the record, except.-those in
 
 .preparatorio,
 
 should bé sti’icken out, or disregarded by the court on the appeal, for the reason that it does not appear that any order had been granted on behalf of either party to take further proofs. But the obvious answer to the objection is that it comes too late. It should have been made in the court below. As both parties have taken further proofs, very much at large, bearing upon the legality of the capturé, without objection, the inference" is unavoidable that there must have been an order for the same, or, if not, that the depositions were taken by mutual consent. They were taken on interrogatories and cross-interrogatories, in which the counsel of
 
 *39
 
 both párties joined, and, among other witnesses examined, is'the claimant himself, whose deposition, with the paper? accompanying it, fill more than one-third of the record.
 

 As respects the vessel, we are satisfied, upon the proofs, that the claimant purchased the Georgia without any purpose of permitting her to be again'armed and equipped for the Confederate service, and for the purpose, as avowed at the time, of converting her into a' merchant- vessel. He had, however, full.knowledge of her antecedent character, of her armament and equipment as a vessel of war of the Confederate navy, and of her depredations on the commerce of the United States, and that, after having been thus employed by •the enemies of this government upwards of a year, she had suddenly entered the port of Liverpool with all her armament- and complement of officers ¿nd crew on board. He was, not only aware of all this, but, according to his own statement, it had occurred to him that this condition of the vessel might afiord an objection to her registry at the customs ; ■ and before he perfected the sale, he sought and obtained information from some of the officials that no objection would be interposed. He did not apply to the government on the subject.
 

 The claimant states “ that he knew from common report she (the Georgia), had been- employed as- a Confederate cruiser, but I thought,” he says, “ if the United States government had any- objection to the'sale, they or their officers would have given some public intimation of it, as the sale was advertised in the most public manner.” If, instead of-applying to an officer of the customs for information, the claimant had applied to his government, he would have learned that as early as March 14th, 1863, Mr. Adams, our minister in England, had called the attention of Lord Russell, the foreign secretary, to the rule of public law, as, administered by the highest judicial authorities of his government, which forbid the purchase of ships of war, belonging to the enemy, by neutrals in time of war, and had insisted that the rule shoqld tie observed and enforced in the wai
 
 *40
 
 then pending between this government and the insurgent ' States.' And also that he had addressed a remonstrance to the British government on the 9th of May, but a few days after,the.Georgia had entered the port of Liverpool, against her being permitted to remain longer in that port' than the period specified in her Majesty’s proclamation. His own government could have advised him of the responsibilities he assumed in making the purchase. Mr. Adams, after receiving information of the purchase by the claimant, in accordance with his views of public law, above stated, communicated with the commanders of our vessels cruising in the Channel, and expressed to them the opinion that, notwithstanding the purchase, the Georgia might be made lawful .prize whenever and under whatever colors she should be found sailing on the high seas.
 

 The principle here assumed by Mr. Adams as a correct one, was first adjudged by Sir William Scott in the case of
 
 The Minerva
 

 *
 

 in the year 180'7. The head note of ]the case is: “Purchase of a ship of war from -an eziemy whilst lying in a neutral port, tó which it had fled for refuge, is invalid.” It was stated in that case by counsel for the claimant, that it was a transaction which could not be shown to fall under any principle'that had led to condemnation in that court or in the .Court of Appeal. And Sir William Scott observed, in delivering his opinion, that he was not aware of any case in his court, or in the Court of Appeal, in which the legality of such a purchase had been recognized. He admitted th.ere had been cases of merchant vessels driven into ports, out o'f which they could not escape, and there .sold, in which, after much discussion apd some hesitation of opinion, the validity of the purchase liad been sustained. But “whether the purchase of a vessel of this description, built for war and employed as such, and now l’endered incapable of acting as ■a ship of war, by the arms of the other belligerent, and driven into a neutral port fpr shelter — whether the pu¡’chase of such a ship can be allowed, which shall enable the enemy, so far to secure himself from the disadvantage into which he
 
 *41
 
 ■ has fallen, as to hatfe the.value at least restored to.him by a neutral purchaser,”' he said,was a question on which he ■■ would wait' for the authority of the superior court, before' he would admit the validity' of the transfer.” He- denied that a vessel under these circumstances could come fairly within the range of commercial speculation.
 

 It has been insisted in the argument here, by the counsel for the claimant, that there were facts and circumstances in the case oí;
 
 The
 
 Minerva, which went strongly to show that the sale was collusive, and that, at the time of the capture, she was on her way back to the enemy’s port. This may be admitted. But the decision was placed, mainly and distinctly, upon the illegality of the purchase. And such,-has been the understanding of the profession and of text-writers, both in England and in this country; and as still higher evidence of the rule in England) it has since been recognized as settled law by the judicial committee of, her Maj'esty’s privy council. In the recent learned and most valuable commen- • taries of Mr. Phillimore (now Sir Robert Phillimore, judge , of' the High Court of Admiralty of England), on international law, ho observes, after stating the principles that govern the sale of enemies’ ships, during war, to neutrals: “But the right of purchase by neutrals extends only to 'merchant ships of enemies, for the purchase of ships of war belonging to enemies is held invalid.” And Mr. T. Pemberton Leigh, in delivering judgment of the judicial committee and lords of the privy council, iii the case of
 
 The
 
 Baltica,
 
 †
 
 observes: “ A neutral, while war is imminent, or after it has commenced, is at liberty to purchase' either goods or ships (not being shjps of war), from either belligerent, and the purchase is valid, whether the subject of it be lying in. a neutral port,or in an enemy’s port.” ' Mr. Justice Story lays down the same distinction in his “ Notes on the Principles and Practice of ’ ''Prize-Courts,”
 
 *
 
 — a workthat has been selected by the British , government for the use of its naval officers, as- the best-code of instruction in the prize law.
 
 †
 
 The same principle is found
 
 *42
 
 iu Wildman on International Rights in Time of "War, a valuable English work published in 1850, and iu a still more recent work, Hosaek on the Rights of British and N eutral Commerce,'published in London in 1$54, this question is referred to in conne'ction with sales of several Russián ships of war, which it was said had been sold ,in the ports of the Mediterranean to neutral purchasers, for the supposed purpose of defeating the belligerent rights of her enemies in the Crimean war, and he very naturally concludes, from the case of
 
 The
 
 Minerva, that no doubt could exis.t as to what would be the decision in case of a seizure.
 
 *
 
 This work was published before the judgment of the privy council ip. the case of
 
 The Éaltica,
 
 which was a Russian vessel, sold
 
 imminenie bello;
 
 being, however, a merchant ship,,' the purchase was upheld; but, as we have seen from the opinion in that case, if it had béen a ship of war it would have been condemned.
 
 †
 

 It has been suggested .thatj admitting the rule of law as above stated, the purchase should still' be upheld, as the Georgia, iu her then condition, was not a vessel of .war, but had bein' dismantled, and all guns. and munitions of war removed; that she was purchased as a merchant vessel, and fitted up,
 
 bond fide,
 
 for the merchant service. But the answer to the suggestion is, that ,if this change in the equipment in the neutral port, and iu the contemplated, employment in future of the Vessel, could have the effect to take her out of the rule,.and justify the purchase, it would always be in the power of the belligerent to evade it, and render futile the reasons on which it is founded. The ride is founded on the propriety and justice of taking away from the belligerent, not only the power of. rescuing his vessfel 'from pressure and impending pei’il of capture, by escaping ‘ into .a neutral port, but also to take .away the facility which .would otherwise exist, by a collusive or even actual sale, of again rejoining the naval force of the enqnry. The removed , armament of a vessel, built for war, can be readily replaced,
 
 *43
 
 and so can every other change be made, or equipment furnished for effective and immediate service. The Georgia may be instanced in part illustration of this truth. Her deck remained the same, from which the pivot guns and others had been taken; it had been built originally strong, in order to sustain the war, armament, and further strengthened by uprights and stanchions- beneath. The claimant states that the alterations, repairs, and outfit of the vessel for "the merchant service, cost some ¿£3000. Probably an equal sum would have again fitted her for the replacement of her original armament as a mail of war.
 

 The distinction between the purchase' o'f vessels of war from the belligerent, in time' of war, by neutrals, in a neu.tral port, and of merchant vessels, is founded on reason and' justice. It prevents the abuse of the neutral by'partiality towards either belligerent, when the vessels of the one arfe under pressure froto the vessels of the others, and removes the temptation to collusive or even actual sales, under the , cover of which they may find their w'ay back again into the service of the enemy!
 

 That the Georgia, in the present case, entered the port of Liverpool to escape from the vessels of the United States in pursuit, is manifest. The steam frigates Kearsarge, Niagara, and Sacramento were cruising off the coast of France and fin the British Channel, in search of this vessel and others that had become notorious for their depredations on American' commerce. It was but a few days after the .purchase of the Georgia by the claimant, the Alabama was captured in the Channel, after a short and brilliant action, by the Nearsarge.. The Georgia was watched from the time she entered the port of Liverpool, and was seized as soon as she left it.
 

 The question in this case cannot arise under the French code, as, according to that law, sales even of merchant vessels to a neutral,
 
 flagrante
 
 bello, are forbidden. And it is understood that the same rule prevails in Russia. Their law, in this respect, differs from the established English and American adjudications on'this subject.
 

 It may not be inappropriate to remark, that Lord Russel]
 
 *44
 
 advised Mr. Adams, on the day the Georgia left Liverpool under the charter-party to the Portuguese government, August 8th, 1864, her Majesty’s government had given directions that, “In future, no ship of war, of either belligerent, shall be allowed to be brought into any of her Majesty’s ports fcr the purpose of being dismantled or sold.”
 

 Decree aeeirmbd.
 

 *
 

 6 Robinson, 397.
 

 *
 

 Page 63, Pratt’s London edition.
 

 †
 

 See 11th Moore’n Privy Council, 145.
 

 *
 

 Page 82, note.
 

 †
 

 See also Lawrence’s Wheaton, note 182, p. 561, and
 
 The Etta,
 
 before Field, United States district judge of New Jersey.